COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present: Judges AtLee, Causey and Callins

JERMAINE ANTOINE TUCKER

MEMORANDUM OPINION*

v.      Record No. 0854-22-1                          PER CURIAM
                                                      JULY 11, 2023

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Tasha D. Scott, Judge

(J. Barry McCracken, Assistant Public Defender, on brief), for
appellant.

(Jason S. Miyares, Attorney General; Virginia B. Theisen, Senior
Assistant Attorney General, on brief), for appellee.


A jury convicted Jermaine Antoine Tucker of one count of second-degree murder and one

count of use of a firearm in the commission of murder. Tucker asserts on appeal that the evidence

was insufficient to prove his guilt. After examining the briefs and record, the panel unanimously

holds that oral argument is unnecessary because "the appeal is wholly without merit." Code

§ 17.1-403(ii)(a); Rule 5A:27(a). For the following reasons, we find the evidence sufficient to

support Tucker's convictions and we affirm the trial court's judgment.

BACKGROUND

"Consistent with the standard of review when a criminal appellant challenges the sufficiency

of the evidence, we recite the evidence below 'in the "light most favorable" to the Commonwealth,

the prevailing party in the trial court.'" *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). This standard "requires us to 'discard

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom.'" *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

On the night of December 11, 2019, Damien Jenkins and Thomas Christian went to a restaurant in Norfolk to celebrate the fact that Christian had just received a master's degree. Jenkins, Christian, and several others were waiting for their food when Christian went outside to smoke a cigarette. Jenkins went outside to check on him a few minutes later and saw Christian smoking and talking to a woman sitting in a "[l]ight colored truck" in front of the restaurant. They appeared to be flirting, so Jenkins went back inside. Shortly thereafter, someone told Jenkins that Christian was "about to fight" outside. Jenkins went outside and saw Tucker arguing with Christian because Christian had been flirting with Tucker's wife, the woman in the truck. Jenkins was familiar with Tucker and knew him by his nickname, "Burger."

According to Jenkins's testimony, which was corroborated by a surveillance video, Jenkins and several others tried to defuse the conflict. Christian walked away from the group, but then returned and approached Tucker with a gun. Jenkins jumped in front of Christian to intervene, walked him away, and convinced him to leave. Christian drove out of the parking lot in his black BMW. As Jenkins turned to go back inside the restaurant, he heard gunshots. Jenkins hid under a car and testified that he did not see who fired the gun. Around the same time, Aleycia Jones was driving near the restaurant when a black BMW cut her off as it crossed Princess Anne Road. Jones swerved and slowed down as she watched the car drive straight across the street and crash into a parked car. She pulled over and called 911.

The surveillance video shows a tall man talking to a woman who is sitting in a white SUV in the restaurant parking lot. Another man approaches and begins talking to the tall man. Two more men approach, and one of them begins arguing with the tall man. The man who began the argument

with the tall man appears to pull out a gun and other people pull him closer to the restaurant while the tall man backs into the parking lot. The tall man then retrieves something from the trunk of the white SUV. Meanwhile, the man who began the argument gets into a black sedan and begins to drive away. The tall man shoots in the direction of the black car. The car hits a pole, crosses the road and a median at a diagonal angle, and crashes across the street. The tall man gets in the passenger seat of the white SUV and leaves. At trial, Jenkins did not reference the video directly, but did describe Tucker's behavior consistent with the behavior of the tall man who appears in the video.

Norfolk Police Sergeant Bryan Carey responded to the scene and met Jones, who showed him the crashed BMW. When Sergeant Carey approached the BMW, he saw Christian slumped over the steering wheel and he saw a black gun in the car. Norfolk Police Detective Tony Ostulano then arrived to collect evidence and sketch the scene. Detective Ostulano retrieved the gun from underneath Christian's feet and recovered bullet fragments from the BMW. The gun at Christian's feet was fully loaded with one bullet in the chamber. An autopsy showed that Christian died from a gunshot wound to the head and that his blood alcohol level was 0.189% at the time of his death. The medical examiner recovered the bullet from Christian's skull and gave it to the police department.

Investigators from the Norfolk Police Department analyzed the phone records associated with Tucker's cell phone number and discovered that Tucker's phone was near the restaurant at the time of the shooting. They also obtained search warrants for two addresses associated with Tucker, an address on Darnell Drive in Virginia Beach and an address on Diggs Road in Norfolk.

Detective Michael Chafee executed the Darnell Drive search warrant on December 12, 2019. It appeared to Detective Chafee that, from the state of the townhouse, the residents were either moving in or moving out. Inside the townhouse, Detective Chafee collected an instruction

manual for a Taurus G2S semiautomatic firearm, a gun box for a Taurus G2S931 model firearm bearing serial number TLS51970, a box of nine-millimeter ammunition, and 28 nine-millimeter Luger cartridges. A police officer also found a prescription medication bottle with Tucker's name and a driver improvement graduation certificate bearing Tucker's name.

That same day, Detective Frankie Gregory set up surveillance at the Diggs Road address and saw a man meeting Tucker's description leave the Diggs Road apartment and get in a car. Norfolk police officers conducted a traffic stop, identified Tucker, and took him into custody. They also searched the Diggs Road apartment and found a black Taurus G2S nine-millimeter semiautomatic handgun bearing the serial number TLS51970. An analyst from the Virginia Department of Forensic Science compared bullets fired from that handgun with the bullet recovered from Christian's skull and concluded that the fatal bullet was fired from the TLS51970 handgun.

While Tucker was in custody at the Hampton Roads Regional Jail, William Williams was also in custody. While sitting in the medical wing, where at least one guard was present, Williams overheard Tucker tell another inmate that if "Dame don't show up, you know, I'll be good." After Williams asked Tucker about "Dame," Tucker clarified that he was referring to Damien Jenkins, Christian's friend. Tucker then explained to Williams that "the guy" was "in [the] car door" where Tucker's wife was sitting and that Tucker had told "Dame" to get his boy. Tucker told Williams that "the dude pulled out a gun and put it in his face and it clicked," as if it had misfired. Tucker then told Williams that he "handled his business" while holding his hand in the shape of a gun. Williams understood Tucker to mean that he had shot the man who had been talking to his wife. On cross-examination, Williams admitted that he testified in the hopes of getting "some type of leniency by helping out the Commonwealth." He also acknowledged that he has prior convictions for petit larceny, unauthorized use of a vehicle, and identity theft or fraud.

- 4 -

After the Commonwealth rested its case, Tucker made a motion to strike and argued that the evidence failed to prove he was the shooter. The trial court denied the motion. Tucker then called forensic scientist Melissa Lucas as a witness. She testified that there was a DNA mixture on the Taurus G2S firearm when it was recovered, but her testing determined that Tucker was not a major contributor of the DNA mixture. She also acknowledged that it is possible to touch something without leaving a DNA mixture on it. After the defense rested, Tucker made a second motion to strike which was again denied. After deliberation, the jury convicted Tucker of second-degree murder and use of a firearm in the commission of murder. This appeal followed.

ANALYSIS

Tucker challenges the sufficiency of the evidence to prove that he "fired the fatal shot" that caused Christian's death. "Second-degree murder . . . is defined as a malicious killing." *Woods v. Commonwealth*, 66 Va. App. 123, 131 (2016). "Malice is evidenced either when the accused acted with a sedate, deliberate mind, and formed design, or committed any purposeful and cruel act without any or without great provocation." *Id.* (quoting *Branch v. Commonwealth*, 14 Va. App. 836, 841 (1992)). Moreover, "[i]t shall be unlawful for any person to use or attempt to use any pistol, shotgun, rifle, or other firearm or display such weapon in a threatening manner while committing or attempting to commit murder . . . ." Code § 18.2-53.1.

"At trial, the Commonwealth bears the burden of proving the identity of the accused as the perpetrator beyond a reasonable doubt." *Cuffee v. Commonwealth*, 61 Va. App. 353, 364 (2013) (quoting *Blevins v. Commonwealth*, 40 Va. App. 412, 423 (2003)). "It is elementary that the burden is on the Commonwealth to prove every essential element of the offense beyond a reasonable doubt. The evidence must exclude every reasonable hypothesis of innocence and be consistent only with the guilt of an accused." *Case v. Commonwealth*, 63 Va. App. 14, 22 (2014) (quoting *Powers v. Commonwealth*, 211 Va. 386, 388 (1970)). "The statement that circumstantial evidence must

- 5 -

exclude every reasonable theory of innocence is simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt." *Taylor v. Commonwealth*, 61 Va. App. 13, 30 (2012) (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 258 (2003) (en banc)). Although the Commonwealth must exclude every reasonable theory of innocence, it is not required to exclude every hypothesis of innocence that may spring from the defendant's imagination. *Emerson v. Commonwealth*, 43 Va. App. 263, 277 (2004).

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "If there is evidentiary support for the conviction, 'the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial.'" *Chavez v. Commonwealth*, 69 Va. App. 149, 161 (2018) (quoting *Banks v. Commonwealth*, 67 Va. App. 273, 288 (2017)).

"[I]n an appellate court's assessment of a sufficiency challenge, circumstantial evidence 'is as competent . . . as direct evidence' to prove the elements of a crime, 'provided it is sufficiently convincing to exclude every reasonable hypothesis except that of guilt.'" *Young v. Commonwealth*, 70 Va. App. 646, 653 (2019) (second alteration in original) (quoting *Simon v. Commonwealth*, 58 Va. App. 194, 206 (2011)). "[I]n a circumstantial evidence case, . . . the accumulation of various facts and inferences, each mounting upon the others, may indeed provide sufficient evidence beyond a reasonable doubt" of a defendant's guilt. *Ervin v. Commonwealth*, 57 Va. App. 495, 505 (2011) (en banc).

> In considering an appellant's alternate hypothesis of innocence in a circumstantial evidence case, we must determine "not whether there

is some evidence to support" the appellant's hypothesis of innocence, but, rather, "whether a reasonable [fact finder], upon consideration of all the evidence, could have rejected [the appellant's] theories in his defense and found him guilty of [the charged crime] beyond a reasonable doubt."

*Emerson*, 43 Va. App. at 277 (alterations in original) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).

On review, we defer to the jury's determination of the credibility of the witnesses unless the witnesses' testimony is incredible as a matter of law. *Juniper v. Commonwealth*, 271 Va. 362, 415 (2006). "To be 'incredible,' testimony 'must be either so manifestly false that reasonable men ought not to believe it, or it must be shown to be false by objects or things as to the existence and meaning of which reasonable men should not differ.'" *Id.* (quoting *Cardwell v. Commonwealth*, 209 Va. 412, 414 (1968)).

Tucker asserts the theory of innocence that a different person in the parking lot retrieved Tucker's gun from the SUV that Tucker's wife was driving, shot Christian with that gun, then got in the SUV with Tucker's wife and drove away, all while Tucker remained in the area. He explains away Williams's directly contradictory testimony by arguing that it was incredible. But the Commonwealth was not required to exclude every theory of innocence that sprang from the imagination of the defendant. *Emerson*, 43 Va. App. at 277. It met its burden by presenting sufficient proof for a reasonable factfinder to conclude that Tucker was the criminal agent who shot Christian.

Surveillance video depicted the entire scene leading up to and including the shooting. Although Tucker argues that the evidence could not prove he is the man on the video and thus the shooter, there was abundant proof of identity. First, the jury had the opportunity to view the video

- 7 -

and see Tucker at trial, to compare the appearance of the shooter on the video with Tucker.[1] Second, Jenkins testified that Tucker argued with Christian before Jenkins and others tried to defuse the conflict, and the video shows that Christian argued with the shooter before the group of people tried to separate the shooter and Christian. Based on that testimony, the jury could have identified Tucker as the shooter on the video. Even though the video shows Jenkins and Christian talking to other people, a reasonable factfinder could have watched the video, found that Christian and Jenkins primarily spoke to only one person, and identified that person through Jenkins's testimony. *See Meade v. Commonwealth*, 74 Va. App. 796, 806 (2022) ("[W]e, on appellate review, view video evidence . . . for the limited purpose of determining whether any rational factfinder could have viewed it as the trial court did."). The same person that argued with Christian and was identified as Tucker was the same person who then retrieved a gun from Tucker's wife's SUV, shot Christian, and left with Tucker's wife.

The jury could have also inferred the shooter's identity through the other evidence that tied Tucker to the shooting. First, the shooter knew where to find the gun in the SUV and left the scene with Tucker's wife. Tucker's cell phone records placed him near the scene of the shooting. Additionally, the instruction manual and gun box for the gun that was used to shoot Christian were found in a house that was identified as Tucker's townhouse and contained other personal items that belonged to Tucker. The gun itself was found in another apartment that was connected to Tucker, and police officers saw Tucker leave that house shortly before they found the gun in the house.

Finally, Williams also heard Tucker say that he will be "good" as long as Jenkins does not show up for trial. Tucker then held his hand in the shape of a gun and told Williams that he had "handled his business" with Jenkins's friend. Through this, Williams understood him to mean that

---

[1] Tucker is approximately 6'4" tall. The video shows that the shooter was significantly taller than the people around him.

Tucker shot Christian. Tucker asserts that Williams's testimony was incredible as a matter of law because Williams has a criminal history and hoped to benefit from his testimony, but those are both facts for the jury to consider in weighing Williams's testimony, not facts that render Williams's testimony inherently incredible. *See Shifflett v. Commonwealth*, 289 Va. 10, 11 (2015) (evidence of prior convictions is evidence for the jury's credibility determination); *Johnson v. Commonwealth*, 58 Va. App. 303, 312 (2011) (finding that a witness's testimony was not inherently incredible when he testified that he "hope[d]" for leniency from the Commonwealth "in exchange for his testimony").

Tucker also argues that Williams's testimony was inherently incredible because it is unbelievable that Tucker would confess to a crime in the presence of guards, but the likelihood of Tucker's confession is also a fact for the jury to consider. Tucker did not explicitly confess to the murder, instead using allusions like "handled [my] business" and stating that he will be "good" if Jenkins does not "show up." Moreover, Williams testified to the same information at the preliminary hearing before details of the case were available to the public, thus negating the likelihood that he learned about Christian's death from someone else. The jury was entitled to consider those facts and determine whether Williams's testimony was plausible and credible. For this reason, we will not disturb their findings on appeal. *See Juniper*, 271 Va. at 415.

Tucker argues that, notwithstanding all the evidence pointing to his guilt, the Commonwealth failed to prove he was the shooter because there was a group of men present before the shooting. But Jenkins identified Tucker as the person arguing with Christian on the surveillance video, and the video shows that same person shooting at Christian's car. The jury was entitled to use the combination of the video and the testimony to conclude that Tucker was the criminal agent who shot Christian. *See Ervin*, 57 Va. App. at 505 ("[I]n a circumstantial evidence case, . . . the accumulation of various facts and inferences, each mounting upon the others, may indeed provide

- 9 -

sufficient evidence [of guilt] beyond a reasonable doubt."). He also emphasizes that his DNA was not found on the murder weapon. However, the fact that Tucker's DNA was not later found on the murder weapon does not render the jury's verdict impossible and even Tucker's expert witness acknowledged that a person may touch something without leaving DNA behind.

The evidence was sufficient to support Tucker's convictions for second-degree murder and use of a firearm in the commission of a murder. The evidence proved that Tucker and Christian argued moments before Christian's death and that after the argument, Tucker retrieved a firearm from the same white SUV in which Tucker's wife was sitting. The surveillance video then shows him firing upon Christian's black BMW as it left the restaurant parking lot. The manual for the murder weapon was in Tucker's home on Darnell Drive, and police officers recovered the murder weapon from another apartment associated with Tucker. Tucker was at that apartment on the same day that the officers found the murder weapon. His cell phone was near the area of the shooting at the time of the offense, and Tucker made incriminating statements at the jail. On this evidence, a reasonable factfinder could reject Tucker's claim of innocence.

CONCLUSION

Upon our review of the record, we conclude that the totality of the evidence presented at trial, along with all reasonable inferences arising therefrom, supported Tucker's convictions for second-degree murder and use of a firearm in the commission of murder. The judgment is affirmed.

*Affirmed.*